Good afternoon, your honors. May it please the court, Douglas Bramley for the Plaintiff Appellant, Raymond DeMaio. I would like to reserve three minutes for rebuttal. It is undisputed in this case that the Plaintiff has established a prime official case of age discrimination. This appeal boils down to one question only. Viewing the facts in the Plaintiff's favor, could a jury find that the company's alleged performance reason for firing the Plaintiff is unworthy of credence? Well, and the judge cited a standard that really doesn't apply here, isn't that correct? That's correct, your honor. What the judge at the district court level said was that we, the Plaintiff, had failed to quote prove by a preponderance of the evidence that there was pretext in this case. That's not the proper standard. Our view is that what the district court essentially did was step into the shoes of the jury, take a handful of our arguments, weigh them against the counter arguments asserted by the company, and decide that the company's arguments were more persuasive. That's ultimately the job of the jury, not the court. Our view is that if you view the facts, you could easily find that the company's performance reason for firing the Plaintiff is unworthy of credence. And we've set forth in our papers all of the facts from which the jury could find pretext, but our argument essentially comes down to four different points, four different reasons why a jury could reject the company's alleged performance reason. And the first centers on the fact that the company argues they were so unhappy with our client's performance in the area of talent management that they had to terminate him. Well, a jury could reject that argument based on the simple fact that the company at no time took any action that would suggest in any way, shape, or form that it had any concerns with our client's performance. Let me ask you about talent now. Career management on the one hand, talent on the other. They identified talent as an area that they wanted him to focus on, right? They identified talent as an area they wanted to grow in the future, yes. So focus on it, grow the business? Yes. He obviously did well in career management and that's not an issue that anybody's fighting about. Here's a couple of things that I didn't understand. There were a couple of points in the record where they said, we want you to reach certain goals. One of them was reach a goal between 200,000 and 300,000 and I believe he reached 230,000. Was that a monthly goal of 200,000 to 300,000? And in the last year, was he hitting it regularly? That wasn't clear to me. Sure. Let me explain how that came about. The way this business was structured was you had Mr. DeMayo, the plaintiff at the top of the region as the general manager. And then underneath him, you had what was called a career management practice leader who headed up the career management side of the practice and a talent management practice leader who headed up the talent management practice. They both reported into Mr. DeMayo. Now he's fired in April of 2010. Going back to November of 2009, he loses his talent management practice leader. He's fired for no fault of Mr. DeMayo's. He's fired for misconduct. So from November of 2009 until his termination, Mr. DeMayo's, in April of 2010, he doesn't have a talent management practice leader, which puts him at a significant disadvantage. So what his boss does to him, his boss's name is George Herman, he comes to him and he says, look, I understand. If you could just, during this period of time where you don't have a practice leader, average between, monthly, $200,000 and $300,000 in talent management billions a month, you'll be fine. He does that. Now he does that in the first quarter of 2010. And I think as you pointed out, his average was $230,000 a month. So he does that and he's fired in April. In 2009, that goal was not in place. He had just lost the talent management practice leader at the end of 2009. But what he did in 2009 was his region ranked third out of seven in the America's group. And over his entire period of time, I guess 2007 until April of 2010, was his ranking in that one, two, three range in talent management? I know for career management it was high, but for talent management? His ranking in 2008 in talent management was five out of seven in total talent management billions. His ranking in 2009 in talent management was three out of seven in both total talent management billions, just raw numbers, and then also third out of seven in the percentage of the target that the company had set. The company set a target every year for each region to hit. And he also was third out of seven against that target in 2009. Is it really the case that we can look at Mr. DiMaio's colleagues' testimony on the subject about why he was fired? They're not decision makers or influencers? I think you're referring to some of his subordinates? Yeah. I think where that comes into play is this. One of the arguments that the company is making here is not just that Mr. DiMaio's raw talent management numbers were poor, but also that he hadn't bought into this whole concept that we need to grow this part of the practice. Well, the problem with that argument is the gentleman who allegedly makes that decision, George Herman, his boss, he's based out in Wisconsin. He never comes to New Jersey, except for one time, I think. He's before the region. He never speaks to anybody. He speaks to Mr. DiMaio. Mr. DiMaio tapes a conversation with him. And in the conversation that Mr. DiMaio himself tapes, Mr. Herman says, look, we have a strategic priority. This is it. You're not on board with it. We can't have that. That seems like a classic business decision that doesn't reflect a desire to punish somebody for their age. Why would we be in court about it? Why is Judge Thompson wrong to say, hey, they told you what? You were supposed to be on this bus. You refused to get on it. That's how it works in the business world. It leaves you behind. I don't disagree with you that the company had the right to exercise its business judgment to make any personnel decision that it wanted. But in this particular case, the question is, could a jury find from the facts that that reason, that business judgment they exercised here isn't believable? And so as to the specific issue of talent management, you have not only the fact that he goes in 2008 from 5 out of 7 in talent management to 2009, he's 3 out of 7. He's improving. In addition, in the first quarter of 2010, the three months leading up to his termination, in addition to setting this monthly goal of $200,000 to $300,000 a month, the company had also approved four metrics that they were going to use to measure the progress of the talent management business. And Mr. DiMeo satisfied all of those metrics. So I think a jury looking at these facts can say, they could certainly say, as you pointed out, this was just a legitimate exercise in business judgment. But they could also say, boy, you know, the facts here certainly don't support the company's allegation that Mr. DiMeo was performing so badly that we had to get rid of him, particularly when you weigh that against his outstanding performance overall, which I don't think anybody would disagree. He was tops in the company for the three years leading up to his termination. Yeah, but a business can set whatever priorities they choose. Certainly. So the fact that he did well in career management really is of no consequence, right? It is and it isn't. I mean, I think the other key point here is this. Did the company do anything during the time Mr. DiMeo was actually employed there that would suggest they had concerns with his performance? They didn't. To the contrary. They gave him a positive performance rating every single year of his employment. They gave him a pay raise every single year. They gave him a discretionary bonus every year. They gave him special stock options. But they gave him a boss who gave him an express warning on more than one occasion. Your respect for your honor, I'm not sure the record reflects that there were express warnings. Well, Mr. Herman has the conversation we just described, right? That's on the termination date. That's when he fired him. It's the day he fired him. Sorry. Well, Mr. Herman, well, to follow up on that, Mr. Herman expressed concern over time, right? I mean, he's always getting on DiMeo about focusing on talent management, about achieving more, and obviously there are numbers that are in DiMeo's favor, but Herman never seems to be satisfied with his progress. I would disagree with that, your honor. I would point to two facts. Number one, in January of 2010, remember, Mr. DiMeo doesn't get a written performance review in 2009. So there's not a single document in the year leading up to his termination that would suggest there In January of 2010, three months, two months before the decisions made to fire DiMeo, he gets a positive oral review. But you're skipping over February 2009 where Mr. Herman has a conversation with him and according to the record, says that the Northeast region was underperforming in talent management and you, DiMeo, are not demonstrating an understanding or appreciation of the future direction of the company in talent management. This is a statement that's at least expressed internally in the company. I don't know whether, when I say you, I don't know whether this is made by Herman to other people, but it's not a, he's saying it within, Herman is saying this in February 2009 within the company, right? February 2009? No, I don't believe he did, your honor. February 2009 was more than a year before the termination. In September of 2009, his mid-year performance was said to be the best performance assessment he'd received. Correct. He got a bonus right before he was fired. $144,000. Yeah, how does that mean in some places that would be a lot of money in terms of a bonus and other places not? Is that numerical? How did that? It's a lot of money. Right. It's a lot. Certainly. Well, the way the bonus structure worked at the company was he had a target bonus of 40% of his base salary. That $144,000 bonus was in excess of the 40% target. So in that regard, it was more than they had to give him. Now, what the company has argued is that the bonus was tied to set metrics, that they really didn't have discretion to was tied in with very certain specific metrics. But did other managers get $500,000 or did they get $40,000? No. I mean, is this big for the company? Well, it was more than his target. So in that regard, yes, it was big. Look, can we go back to a question that Judge Jordan asked you that I just want to put to about whether we should or can take into account the assessments of his subordinates? As I started to say, I think it comes into play in that the jury could sit there and say to themselves, here's a man, George Herman, who claims that in his view, Mr. DiMeo was not buying into this whole concept. And yet, he's 1,000 miles away in Wisconsin. He's never visited the region. He's never spoken to any of Mr. DiMeo's subordinates or reports to find out, hey, is DiMeo briefing you guys on talent management? What's he saying in meetings? Because what they have said on the record is every meeting we had with Ray DiMeo, he's pushing talent management. He's telling us we've got to improve this area. We've got to grow this area. That's inconsistent with what the decision-maker claims in this case. If my colleagues will indulge me, there is an answer. There is a February 2009 conversation that's reflected or at least it's asserted to have taken place by the defense here in response to your interrogatory number four on page 166 of the appendix. You asked for any conversations that, quote, refer or relate to the subject matter of this action, and they cite this statement by George Herman in New York City advising Mr. DiMeo that the Northeast region was underperforming in talent management and that the plaintiff had not demonstrated an understanding or appreciation of the future direction of the company in talent management. Then there's another conversation that same month in Boston where the plaintiff says to Mr. Herman he's been thinking about his performance review and he wonders if Mr. Herman's lost confidence with him in his role. So clearly there's asserted to be and there's evidence in the record that there is this that he's told long before the firing we don't think you get it. We don't think you appreciate what's going on. Is it wrong for the district court to focus on that and think that overwhelms your arguments about pretext? Yes, I would suggest it does. It is wrong for the district court for three reasons. Number one, that conversation in Boston that you refer to, Mr. DiMeo disputes the nature of that conversation in his deposition testimony. Number one, even assuming that that conversation took place in February of 2009, the record shows that in September of 2009 Mr. DiMeo got a positive oral review from George Herman and then in January of 2010 he got another positive oral review from George Herman. So a jury could find from those facts that any concerns that may have existed in February of 2009 were gone by the time we get to the good review in September of 2009 and the positive review in January of 2010. Mr. Herman was never deposed, was he? He wasn't, Your Honor. We attempted to depose him. He wasn't produced. He unfortunately passed away. Thank you. All right. We'll hear from you in rebuttal. Thank you. May it please the Court. Heather Boschak of Fox Rothschild for Right Management. I think as was illustrated in the argument of plaintiff's counsel, this is a situation where the plaintiff feels that he should be able to decide the business strategies of the company. How about the plaintiff feels he ought to be able to get in front of the jury when there's conflicting evidence? If there was conflicting evidence, I think that he would be able to make that argument. I don't believe that the record that's before this Court shows conflicting evidence. I think the record supports that the company has been focusing on talent management and has been speaking to Mr. DiMaio about their concerns about his talent management from 2007 up through the time of his termination. He specifically testified at his deposition that those were issues that were raised to him. Sorry. Go ahead. There's lots of other issues. Let's just look at one fact. I'm sure all of us can come up with many. The last six months under Mr. Herman until he was fired, there was a matrix set meet $200,000 to $300,000 in billings, and the representation was I remember $230,000. I think the representation from your adversary was that he met that $200,000 to $300,000 the last six months. Is that not so? Mr. DiMaio was struggling in his performance, and they tried to work with him to help him, so they set lower goals for him as evidenced by that he had the biggest region. What data shows he was struggling in his performance? Because he has the biggest region in the whole company, and his raw numbers, the raw billings that were coming out of his company are smaller than much smaller regions. Wait a second. In 2008, he was fifth of seven, and then in 2009, he was third of seven. Well, I think as the company has testified, and it's undisputed, that it's not just a matter of raw numbers. It's what they expected out of this region that was able to produce these big clients and career management that was supposed to be a springboard for them to be able to supply the other. Didn't they say it was all about talent? They said it was all about talent management, right? The reason for the termination was because he was not showing them what they needed to see to develop the talent management in the region. But talent management was like 20% of the total business. How could that be the be-all and the end-all? Well, as the company had been saying since 2007 and 2010, it was the whole meeting for the company that it's a game changer. We want to focus on talent management. We want that smaller number to be increased. And that was January of 2010 when they gave him the goal that he then met. The game changer thing was a big hoopla in, I think, January 2010, wasn't it? The game changer meeting was in 2010. And then he was fired in April. Well, they had these talent management meetings. They had phone calls in January, February, March, for the regions that they found were struggling in talent management. And during those calls, Mr. DeMeo was on the phone with his boss, the president of the company, and the CEO of the company. And they wanted to drill down how he was going to get the results for talent management. And the two that testified about those calls all found that he wasn't able to articulate the plan. He wasn't familiar with the information of what they were doing. And he was woefully off on his forecast, meaning that he wasn't in touch with his business. Then why do they keep giving him positive reviews? I'm sorry? They keep giving him positive reviews. He has never gotten a positive review on talent management. Well, you know, when you say you didn't get positive reviews on talent management, the plaintiffs come to the table and say, here are his job evaluations. He's getting satisfactory or above in all his job interviews and reflections. And he's increasing overall revenue. I mean, in the midst of the worst recession the country's had, he takes them from under $40 million to $60 million in combined total revenue. And that was expected, given the nature of the career management business, was to do outplacement. And given what the recession and that overwhelming amount of need for that service, it was expected and it was experienced in all the regions. But even if you disregard career management and whatever success he had, put it aside. If the company sets a focus and then sets goals and then an employee meets and understands the focus and then meets the goals, doesn't that seem to raise some questions that a jury should resolve? I mean, particularly even if it is, as you say, there was displeasure in the January 2010 meeting, if goals are set by management and then those goals are met by the employee, that's got to create a question that a jury should resolve. Well, Your Honor, I respectfully assert that it doesn't. If he's meeting a minimum of one part where they didn't find satisfactory to begin with and then other indicia are showing that he's just not doing what they want to do, he's not able to forecast. We want to talk about, there's been some discussion about relative, you know, where he ranks in the talent management looking at just raw numbers where his should have been biggest region, the biggest. But in the first quarter of 2010, he drops. He's down at six out of seven. In February 2010, he's seven out of seven. He is the only, he's operating at a loss. Did you concede there was a prima facie case made here? Yes, we did. Okay. That means the argument really is about pretext, right? Yes. So, and isn't pretext classically a question of fact? Well, there needs to be sufficient evidence that the district court, I mean, I feel the plaintiff's counsel has tried to rule out any role that the district court would have in analyzing pretext. And that's not true. I think that what I hear the plaintiff saying is the district court applied the wrong standard. Well, the way I read the court, excuse me, the plaintiff's briefs is that basically the district court has no role and shouldn't be applying any standard. But I think that's contrary to third circuit precedent. Well, no, it said shouldn't be weighing evidence, which seems like what happened here. Yeah. Why don't you speak to the specific quote that they put in their reply brief? The district court held that summary judgment was warranted because the mail had, quote, failed to prove by a preponderance of the evidence that RMI's reason for firing the mail was a pretext for the discrimination, unquote. Would you agree that on summary judgment, that's just flat wrong? Well, the court is supposed to weigh the evidence. No. Is that a correct standard? No. It's supposed to weigh. Assess. Assess. Assess. Weigh means this way. The court's supposed to determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable fact finder to conclude. It's supposed to review the adequacy of the showing. Right. And I think our questions point out that there is something to be said on both sides here. And there is a question. What about the fact that when he was fired, the company wanted to say that it was by agreement? Well, the company had sought at the meeting to try to see if he would do it as a resignation rather than a termination out of the interest of Mr. DeMeo. Nothing was ever distributed to the company that said in the end there was a draft memo, they were prepared. But then the coworkers said, well, you better not do that because people aren't going to believe it. Well, and they didn't do it. They were being prepared. They were trying to be ready to go in advance. He is a high-level executive who runs a region, and they needed to be prepared to move forward. So they were prepared with an announcement, and they had hoped after the meeting they would be able to reach an agreement that it would be a resignation rather than having to proceed with it as a termination. Mr. DeMeo didn't want to go that route, so they didn't go that route. They issued an announcement that said he's gone, and it's undisputed that he was involuntarily terminated, and nobody has asserted any other reason. Do you want to answer my question about whether the district court applied the correct standard? I quoted to you the language of the district court. Is that a legally correct standard for the district court to apply at the summary judgment stage? I think that the concluding sentence in the district court's opinion where it says that he didn't prove that there was sufficient evidence by a preponderance of evidence, that is not the role of the district court. However, reading the district court's analysis and earlier in the district court's opinion, I think it's at page 12, it talks about it needs to evaluate whether there's enough evidence that if the jury believed the plaintiff's evidence would prove by preponderance of the evidence that he wins his case. So I think the analysis that was conducted by the district court was proper in terms of trying to determine whether the evidence was sufficient to meet that burden if the jury was to believe what the plaintiff was saying. I think that the concluding sentence is poorly worded. Yes. So I do, and going back to the talent management issues, I mean, plaintiff did get bonuses. Plaintiff didn't get a bonus for talent management. It's undisputed. There's a whole worksheet in the record that shows he got zero for talent management. His concerns about talent management and his performance in talent management were throughout his employment. And I think it's very important to look at these phone calls that happened in January, February, and March, and the concerns that were raised by his supervisors, who do get to judge his performance. So that's who he needs to prove he's doing his job to, not his subordinates, it's his superiors. And they found that he was not doing a good job. He was having issues forecasting the talent management business. He was off by over 100. Was he told that in 2010? Yes. Were there meetings or phone calls where he was told that? Yes. He testified specifically that George Herman called him after one of the meetings and told him he was very disappointed in his inability to forecast. There was also an email that was sent by the president of the company to him three days after one of the meetings where he gave a forecast where he downgraded the numbers even more and wanted to know how they can change so much in three days. So these issues were discussed with Mr. DeMeo as he conceded they were. And so the record is very consistent that there has been a focus on talent management and a focus on Plaintiff not meeting or living up to the objectives that the company wanted him to do in talent management. At the end of 2008, Herman says in the year-end review, this significant miss on the talent management side was a big disappointment given the size of the markets and the impact it had on the overall America's result. Was there a similar determination at the end of 2009 with regard to DeMeo's talent side performance? There were no reviews done in 2009. I mean, unfortunately, Mr. Herman had some medical issues, and there were no reviews done for any of the people who reported to him, so we do not have any kind of statement. I thought that your adversary said that there was a positive oral review, I want to say in September of 2009, he said. Well, the Plaintiff has testified that there was a review. He said it was positive. I mean, with respect to talent management, I think he testified something to the effect that you're holding your own in talent management. It wasn't an effusive statement about talent management. But we do not have – I mean, unfortunately, Mr. Herman passed away. No, I get that, but that is the state of the record, right? I mean, the state of the record is that in September, or if I have the month wrong, please correct me, of 2009, there is a positive assessment of some type or sort with regard to DeMeo's performance in talent management. Is that right? From Mr. DeMeo's perspective. Well, you don't have any rebuttal of this. I do not. You just said you don't have anything to contradict it. So, you know, the jury, I guess, could say he's lying, but then that's a question for the jury, right? Well, I don't have anything to rebut his statement about the September 2009 oral conversation he claims to have had with George Herman. But I think that the jury would have to look at what happens after. The fact that in 2010, first quarter, we have a declining talent management. We have these three phone calls where he's not showing that he's performing. He's missing his forecast. He's not getting – he did not get any talent management bonus, but in 2009 – He developed four metrics. I'm sorry? In 2009, he developed four metrics that they approved to track and measure the talent management practice, correct? And he met those. Well, he put forth metrics which, as the President testified, he was very disappointed to see what they were because he thought he should have been a further along. But they approved them. According to Mr. DeMeo. I mean, the President, Mr. Matthews, said that he found them woefully insufficient. What's a KPI? Key Performance Indicator. Okay. And those drive bonuses, right? Well, they're one component of the bonus. There's many components to the bonus, and including there's a component of the KPIs that are bonus. There's also a component that was talent management. And, again, he got zero for 2009, which speaks to – when you asked me about the September 2009, we know that his talent management wasn't where it wanted to be because he was only showing 47% of where he was when they did the bonus calculation, and he got no bonus for talent management. His bonus overall, the 144, was, like, in the middle of the pack of the others on bonus. Am I wrong about that? I mean, I think it was considered a good bonus. I mean, it wasn't – I mean, it was – actually, 2009 was less than 2008. He got 148 in 2008. But, I mean, it wasn't – I mean, 2009 was an amazing year in career management, and Wright Management wanted to share some of that with its employees, and people got good bonuses for 2009. But, again, reflecting on his talent management performance in 2009, he received zero bonus for talent management, which is consistent with the concerns that the company has raised and the reasons that his employment was terminated. I mean, there's been very much consistency, and I don't believe there's been evidence that – sufficient evidence, substantial evidence. I mean, showing a pretext is not a small burden. As Fuentes described it, it's a difficult burden. You know, the courts don't sit here to judge the personnel decisions of the employer, so the plaintiff really needs to come forward with significant evidence to show that there's implausibilities, and the evidence has only just been consistent. The talent management was important to this company, and Mr. DiMeo was not meeting the requirements or what they wanted to see out of him for talent management. Is a jury – would a jury be able to, in determining pretext, say that the career management numbers are leading the company? It's not the focus that the company has established, but it is – you know, zounds more than talent management, whatever they expect, whatever anyone is producing, and that the fact that there is this focus on talent management, despite the fact that career management is so much dominant and so much larger, that that is an element of pretext that could be taken in favor of DiMeo? Or that could be used as an influence in favor of DiMeo? I don't think it should be. The requirement is for the plaintiff to show pretext based on the proffered reason by the employer, which is the talent management. The numbers in career, we all agree, they're very good, and that was good for the company. Mr. DiMeo got a nice bonus on it, but that wasn't where the company wanted to go, and it's undisputed in the record that that's where the company wanted to go, was talent management. Mr. DiMeo concedes this. It's from the top down that talent management was driving where they wanted the direction of the company to go, because they viewed career management as cyclical. We're not going to have as much outplacement every year as we did in 2009, hopefully. Nobody wants to see that. This is where they wanted to drive the company to be able to continue the company and continue as a profitable company. The fact that plaintiff had been looking at overall performance, that is not what the employer has put forth, and that is not part of the analysis of pretext. Thank you. Thank you. I would just like to make two very quick points. Council focused heavily on the fact that Mr. DiMeo didn't receive the talent management portion of his bonus in 2009. The only reason he didn't is because his region's talent management gross profits didn't meet the target set by the company. However, not a single region in the Americas Group met their target in talent management gross profits in 2009, and yet Mr. DiMeo, the oldest general manager, was the only one who was fired. The second point I want to make is with respect to these phone calls that took place in January, February, and March of 2010, what occurred during those phone calls is hotly contested. Mr. DiMeo testified that the feedback he received from senior management on those calls was positive. Now, only a jury can decide who they wish to believe. Unless there are any other questions, thank you. Thank you. The case is well argued. We'll take it under advisement as the prior to recess court. Please rise.